125-1674 in the Estate of E.A. Would the attorneys that are going to present oral argument please step up to the podium and identify yourselves by name and if you would also spell your last name. Good afternoon, Your Honor. Rochelle Maroney. I'm O-R-R-O-N-E. I represent the Avalos. Ms. Maroney? And John Whitcomb, W-H-I-T-C-O-M-B. I represent the Appellees and the guardian of the person in the estate. Before we proceed, you notice the clerk called the case in re E-A. We're not going to be mentioning anything other than initials during the presentation. All right? Yes. Okay. So with that, Mr. Whitcomb, you may be seated. And Ms. Maroney, you may begin your argument. May it please the Court. My name is Rochelle Maroney. I represent the Avalos, who are the original co-petitioners in the Estate of E.A., who is a minor. We come to you today on appeal after a best interest hearing for E.A. where there are two competing petitions for co-guardianship. My clients are the paternal grandparents. They were the original petitioners. The cross petitioners were the paternal aunt and her husband, Warrior Ronica and Casey Lysarczyk. The issue brought on appeal today is whether the trial court abused its discretion in ruling that it was in the best interest of E.A. to appoint Casey Lysarczyk as the sole guardian of the person in the estate of E.A. The Probate Act does not provide a best interest standard for the court to follow. Normally, courts usually borrow from the Marriage and Dissolution of Marriages Act or the Juvenile Court Act. Why do you believe we must rely on the best interest factors of I.M.D.M.A. Section 602? I don't believe that we need to rely on it, but I do believe that they are instructive. And when we are looking to the best interest of a minor, the two statutes, the I.M.D.M.A. and the Juvenile Court Act, are very astute. They're very thorough, and they give us a really good guideline as to what the best interest of a child to appoint a guardian would be. Have you ever, though, seen a case in which a guardian was appointed by the Probate Court where the court looked to the Juvenile Court Act? I have not. There isn't? There is not. Okay. But I do, when I read the statute, it was very detailed. Especially when we're dealing with parents, the aunt in the child's life, or our deceased, and we're looking at two different sets of guardians, that might not be apparent. And the Juvenile Court Act is designed for a court to pick a guardian that is not either related or a close parent or a close relative. So I think it is a very detailed act that is very instructive and offers substance for a court to make a proper decision when deciding whether or not somebody or two people should be guardians. But didn't you even forfeit that argument because you didn't make it to the trial court below, did you, and then you didn't cite any precedent for us? I don't think I waived it. There was no law cited in the trial court. It was just based on ruling. There was no law cited by the court. There was no law cited by us. And look, the court likely didn't recite factors because there's no obligation for the court to be constrained by strictures of other acts. There are no factors outlined in the act appointing a guardian in the probate act. That is correct. But without citing some kind of act or looking to some kind of case law, then it becomes arbitrary. And then instead of being objective, it becomes arbitrary. But there has been one thing and one thing only, the best interests of the minor, which then becomes almost like a personal opinion of the court instead of what our law should be. Well, this hearing was about, I don't know, several days, 10 witnesses. The court gave a decision. That's correct. How do we review that decision? We review that decision by going through whether or not it was in the best interests of the minor. That's the standard of our review. The standard of review? Abusive discretion. And looking at the record, ENZO's, or excuse me, EA's desires, wishes, well-being didn't seem to be taken into consideration. Being part of this trial and listening to the witnesses and listening to the testimony and listening to the judge's ruling, it seemed to me that the adults, the four adults in the room and what their feelings and what their desires and what their wants and what their needs were, were taking precedent over the child. The court focused on the lack of communication between the four adults, which that's not a standard as to whether it's in the best interest for EA to have a guardian or not. The adult's feelings do not matter. EA's feelings matter. So EA gave a preference, which I wouldn't even call it a preference. It was more of this is what I want. It's not I prefer this over one thing. I want this. I don't want this. That was not really taken into consideration. The other issue is when a child tells somebody that they don't feel safe and they don't trust a certain group of people, but they do trust and they do feel safe and secure and happy with another side of the guardian, an item that was appointed by the court, say, in contrast to what you're saying now. What did the guardian say about whether or not the child felt safe or had trust? She repeated what EA said to her. The court found that very poignant. But then she continued to go on about how she felt maybe there was a lack of boundaries in the grandparents' home because the child knew about the visitation orders. My argument is you're putting it's a catch-22. You're telling a child who is refusing to go visit somebody that they have to go visit them, and when you're battling a child, you're trying to honor court order. We're not talking about somebody who is 3 or 4 or 5 years old. We're talking about somebody at this point who is 11 going to be 12. But didn't the GAL testify that when she tried to explore with the child what he meant, that he couldn't substantiate anything as to what he meant as far as being able to trust and be safe and secure and so on? I don't believe that was the conversation that was had. I believe he was very adamant. I feel safe here. I don't feel safe there. In order to feel safe, I have to develop trust. I do not have trust with them yet. So the GAL didn't testify that when she tried to explore that, what he meant by that, that he couldn't come up with something to substantiate what he was saying? I do not recall that being in the record. Okay. I thought one of the things the GAL was also saying was that all four of these adults need to be in EA's life and that the thought was, given the rancor, I guess, between three of the four, choosing the uncle who he would be the one person who could maybe bring these other people together. But the overall goal, I thought, of the GAL, and I think the court agreed, was I'm not really picking one person to the exclusion of three. I'm trying to do the best thing that I can to make sure that all four remain in his life. Yes. And I do believe the trial court, what the trial court tried to do, was to stop the civil war that was happening between four people. But, again, that's not the standard. That's not his job. But why was he doing that? He was doing that for the benefit of the minor, right? That would be a factor in determining what would be the best interest of the minor. But, again, whether or not four adults can communicate with each other is not the only and most important reason as to what would be the best interest in a minor to choose one guardian over another. Well, that was the judge's decision, though, to determine what was in the best interest of the minor and to say that he wanted to make certain that he could bring all of the people or persons together, that the best way to do that would be with a person appointed as a guardian who could communicate and effectively keep everyone, everyone in the child's life to stay within the child's life. I believe that was very important that he accomplished that particular goal. I believe that was the court's hope that that could happen, but there was no evidence that that was actually going to happen. But wasn't there evidence and testimony that the guardian who was appointed was able to communicate with everybody? That was the court's conclusion. But the communication between all of the people that were involved, the guardian that he appointed was the most likely person that could facilitate keeping everyone, all of the people that were close and loving of this child. Did the way to effectuate that was the appointment of the uncle? I don't believe that was conjecture. I don't believe that there was any solid evidence that that could or would happen, and I don't believe that. So you're saying the judge was making some sort of speculative decision off the top of his head or something? I wouldn't say it was off the top of his head.  Is that sort of equating with speculation, I guess? Yes. Okay, thank you. And I do believe that there was some speculation in this ruling. It's why we appealed it. One of the reasons why we did appeal it. But is it unreasonable to think that the best thing for this young boy is to have all four of those adults a part of his life? That was certainly part of the question. You can characterize it one way and say that's just adults fighting, and, you know, that's not in the child's interest whether they're fighting or not. But the point, I thought, was to, if possible, find a way to surround all four of these adults around them, the grandparents and the uncle. It's not unreasonable to think that would be in the best interest of the child. No, but the issue becomes is that the reality? Is that what's actually going to happen or is what actually is happening? Well, no one can... But we kind of always have that situation. Judges don't have those crystal balls, do they? Right, exactly. So, I mean, our issue is that with all the factors you can look into with what is the best interest of the child, communication between four adults is not the top factor. Why don't you tell us what the predominant factors are that favor a reversal? Where the child feels loved, where he feels safe, where he feels secure. His living arrangements. E.A. was always raised as an only child. By him being moved, he then had to share a room, which he had never done before. Would it be reasonable to take into account the age of the various petitioners? It's always a factor. Their health and, you know, how they maintain themselves physically is also a factor, yes. I would say that would be a factor. This young boy, unfortunately, has had a lot of trauma in his life. He's lost two parents. That's a big change. If guardianship were given to people who were quite advanced in age, at least compared to the other alternative, it would be reasonable to worry that maybe, God, I never want to predict how long anyone's going to live, including myself, but how old are they now? I believe they're 79.  And that's a reasonable thing to take into account, too. It's absolutely reasonable. Did the judge discuss that? No.  Did the guardian? Pardon me? Did the guardian discuss that? The guardian ad litem was concerned statistically that there could be another loss. Didn't she also speak with therapists about this particular issue? I believe so. And report it to the court of hearing? I believe that the minor suffering of second losses was a concern of hers. But we also don't have expiration dates. We don't know when we're going to become ill. His parents died young. They've outlived him. His aunt and uncle could pass away unexpectedly. We don't have that kind of information. Many of that can happen, right. And you were talking earlier about him having to share a room, but he hasn't had, like, sibling figures in his life, and now he was, isn't that a best interest factor, that now he has sibling figures in his life, right? It can be, but you could also, only children have a certain way of needing attention or wanting attention that he would have to adapt to maybe not getting the attention that he's used to. And in certain circumstances, that might not be an issue, but Enzo has been through a lot of, excuse me, EA has been through a lot of tragedy. So I think the placement of him being with his grandparents for as long as he was and moving him, I think the trauma and the psychological trauma and physical trauma and emotional trauma wasn't taken into consideration either. Well, before there was this sort of breakdown in the communication, wasn't this child spending time with all the interested parties, so to speak? To an extent he was, but there was also issues with him wanting to go visit the Capolis. You know, most of the cases talk about using the factors in Section 602, but they all indicate that the probate court has power from the common law to determine the best interests of the minor. So in this case, was that a factor that the judge could consider? Of course, yes. The law also says that, you know, to appoint a guardian it should be convenient and necessary, and it should be a necessity. I don't think anybody's arguing that there was no necessity here, but the convenience of taking EA from one place and moving him to another where he's changing schools, changing friends, changing rooms, changing his lifestyle. Wasn't there going to be a new school involved regardless? Going from grammar school to junior high? Middle school, junior high. But he would be going with his same friends that he was with instead of starting a new school with almost nobody that he knew. Well, actually, didn't he know his cousins for years and also friends of the cousins that he associated with and met with going to camps for, like, I think it was four years in a row? They were younger than him, so they were not going to be in the same class. But he knew other children from the area where his own cousins lived because he had spent quite a bit of time there with those cousins. Knowing children and actually them being your friends and losing your friend group is, I think, especially prepubescent. It's very traumatizing. Well, it's also a very critical time in the child's life, isn't it? Yes. And that was another factor that the guardian talked about, that there had to be some kind of guardrails or, you know, some kind of parenting relationship. Did she not? Yes. But I believe the petitioners had already established that relationship with EA. You would agree this was a difficult decision for a judge, wouldn't you? Oh, 100%. And maybe that's why there are no factors that the court actually has to consider because it's had this power to determine the best interests, going back to the common law. But how would you describe the standard of review that you said we are bound by? We review the judge's decision for an abuse of discretion, right? Yes. How do you, you know, define it? Tell us what you think abuse of discretion means because we're reviewing whether the judge abused his discretion when he appointed the guardian. Isn't it arbitrary, unreasonable, and no one else would ever agree with what the judge did? Yes, I would agree with that. And I'm reading the court's order. The court focused on three of the parties could not foster communication with each other and then he extended it to other family members that maybe they saw at Christmas or Easter or Thanksgiving. I don't think that is as important as how the child's safety, his trust, where he's comfortable, where he's flourishing, where he was thriving. The record reflected that E.A. was doing very well in school, that he had adapted to the circumstances, that he was not getting sick anymore that first year after his father passed away, that he was sick quite often, he missed a lot of school. Let me ask you this question. Was it important at all that the judge made a determination that the grandparents and the aunt and uncle and then the wife of E.A.'s father, they were all involved in his life? Right. And didn't the judge think it very important that there be a relationship that the child could have with all of the adults in the room, so to speak?  Okay. And so didn't the judge want to make certain that he could figure out a guardian or guardians who could implement this continuing relationship with all of those people? Again, I believe that's the idea that the trial court had, but how do you enforce that that relationship is going to be maintained? Well, you know, we can't predict the future, but my question is, was that important? And should it be important that the adults could have, that they should all be part of this young child's life? It's a factor, yes. Okay. And it's a very important factor, isn't it? I believe it's an important factor, but it's not the most important factor. Well, what do you think is the most important factor? The most important factor is the child and the child's wishes. Not necessarily his wishes, but where he feels the most love, where he feels the most comfortable. You think that's the most important factor, and it's not based on any case. You know that. There's nothing. There's no case that says that that's the most important factor. In fact, the Probate Act doesn't have factors for the judge to determine, but you're saying the most important factor is the wishes of the child. Yes. A 12-year-old. Actually, he was 11 at the time. I do. What case do you raise there? Give us a case. Give us authority.  In the estate of Reginald Shooks, 149LF3D793, 1986, the court ruled that we must protect the minor, that the feelings and desires of the adult parties are inferior. Inferior to what? The child's feelings. Read that to me again. The feelings and desires of the adult parties are inferior in this regard to the child's. In regards to what? I'm not getting the rest of it. The child's wishes and desires.  All right. Counsel, there's no question that what the child wants is something that's going to be taken into account, but we have seen cases even when children, and I'm not saying this is our case, I'm not saying that, but we've seen cases even where children were in abusive homes where they were accustomed, they wanted to stay with what they were accustomed to, even if it wasn't a good thing. They wanted to stay with a mom who was being abusive. And, again, I'm not saying that about these grandparents at all, but this would not be the first time a judge in a difficult situation like this would see a child want to stay where he is at the moment. And I hate to use the phrase the devil, you know, because I'm not calling him devilish, but you know what I mean. And it's not that we don't care what he has to say. Of course everybody cares what this boy has to say, but trial judges sometimes have to say, yes, you want to stay where you are right now because it's what you've known for a while, and you've drunk some measure of comfort. And I think what the trial judge said, and I'm not going to get his words right, is this will be a short-term adjustment, no question, but in the long term, this is the better place for him. All these things taken into account. And we have to ask the question, would any reasonable judge reach that conclusion? And you have to convince us that no reasonable judge would come to that conclusion. So where would we come up with that conclusion, that no reasonable judge could have reasoned that way? I think one of the steps that is missing here is UNZO did have therapists, UNZO did have school psychiatrists that could have came and testified and would have probably painted a better picture as to how traumatizing any kind of move would be. I think the assumption is because of his age that he would adapt or survive. My clients feel, why should he have to? He was thriving where he was, why does there need to be a move? So it doesn't mean that if they were the guardians, that there wasn't going to be or couldn't be visitation with the co-guardians. It's a huge disruption in his life that happened because he was with his grandparents on and off since he was born. They were always in his life, always living with him on and off since he was born. And the last two, after his father passed, he lived with them. And he had his certain routines and he had his room and he had his friends and he had his school and he had his activities and he had his life. Who was he living with before his father passed away? He was living with his father and Barbara Cascio. Right, and how old was he then? Nine. Okay. And then before that he was living with his grandparents, with his father. And his father wasn't married to Barbara, right? No. He was a girlfriend. That's correct. Anything further will certainly give you some time for rebuttals. I'll take my time for a rebuttal. All right. Thank you. Thank you. Thank you. Mr. Whitcomb, you may proceed. Thank you. May it please the Court, I, along with Mr. Reed and Mr. Willowette, represent Tassamere Liz Carrick, and who's the plenary guardian of the person and the plenary guardian of the estate in this. This trial was done by skilled people. I want to start out with that. Ms. Maroney, representing her clients, is a skilled practitioner. She is skilled in this area. She came and represented her client. Ms. Reed is also a skilled practitioner. She represented our client, who became the guardian at this point. Ms. DeConstanza, who was the guardian ad litem, is skilled and has years of experience in this area in order to do that. She did her job. She provided copies of who she interviewed, what she learned from those interviews, so that all the parties could tell. She did a recommendation. She also stated that all four of the people seeking for E.A. to be his guardian, I will use they, E.A. is now using they, so to their guardian, would make a fine guardian. So we have a situation where there was tragedy. His parents have died. I'm sorry. Their parents have died, and we now have four people stepping up to the plate. The trial court and the judge, in this matter, is a skilled jurist as well, long in this division, and is set with a situation that he talks about before he made his ruling. He said, I'm going to take a day, but when he actually talked about why he was taking the day, he said exactly what I just said. He said, this is a tragedy, but I'm in a situation where I don't always have people stepping up to the table on this, and in this situation I have four, and I'm going to do the best that I can, and these are what I'm dealing with. And he talked about relying on the guardian ad litem in that case in order to facilitate him making his decision. As we've stated before, the factors are not listed in the Probate Act. I listed factors in the termination part of what has to be determined on that. They are similar in the factors. You were relying on the revocation of letters section of the Probate Act? That is absolutely right. But we don't have to rely on any statute in this case. No, I don't think you do. Don't the cases all say that? The power to appoint a guardian is vested in the court from the common law, and the only determination that a judge has to make is what is in the best interest of the minor. I believe that's correct. And they have considered the other factors listed formally in 602, but every case pretty much acknowledges those are factors that may be considered, but the judge did not have to go through a list of factors, certainly not the ones you've presented and certainly not the ones that Ms. Moroney has presented. I agree with that entirely, that the factors both in the probate court and because traditionally the court has relied on the domestic relations standard, that the court can pick and choose as long as it doesn't meet the standard, which is arbitrary, capricious, and no reasonable person would come to this. Traditionally, judges have been said they're calling balls and strikes, right? But this is not a ball and strike situation. This is not ruling on objections and motions. This is like making a final decision as to who they believe, based on their experience and the evidence before them, of who would be making decisions on behalf of EA in their best interest. So if the grandparents were good people, capable guardians, and the EA was happy there, what is your argument for why we should uphold this rule? Well, my argument is the judge listed the factors that he considered and those factors were appropriate, and that his factors that he determined in the decision was that there was a lack of boundaries in the house. Not that they didn't love EA, but that there was a lack of boundaries in the house, and that was corroborated by both testimony and the GAL's determination. So the lack of boundaries, the judge specifically stated they're acting more like grandparents than parents. We're going to put them back into the role of grandparents. Again, litigation is strange when it deals with children. I have to say that because the way the briefing went back, it sounded like both people were bad people. The court never determined that. The court determined that they were both good people and able to, and frankly, if the court had determined that the grandparents, we'd be in the same situation. This was a close call. This was about adults who could deal with each other and somebody who was going to mediate that gap. No, if you want to, I mean, I don't think the judge listed factors one by one or anything like that. No, he didn't list them. But I know that he did say this. The court said that by all accounts, they, there is, the child is well-behaved, bright, thoughtful, artistic, and articulate. He has experienced a significant amount of trauma throughout his young life and now regularly attends therapy and obtains assistance at school. The four petitioning parties all, all clearly love and want what is best for EA. In addition, he has spent a significant amount of time with his father's former girlfriend and developed a strong bond with her. The GAL opined that all five adults are critically important too. The child and should remain in his life. She, the guardian, also opined that either pair would make excellent co-guardians. Nevertheless, the guardian ad litem testified about the lack, like you began, I believe, various boundaries. So the judge made, there's additional findings that he made. Yes. So the question at the end of the day is, did the court, I think as Justice Ellis already pointed out, was there an abuse of discretion? Is there anyone that would say that no reasonable person would agree with the decision that he made in what is, there is no question, a very complicated case. But at the end of the day, a decision had to be made. Yes. I would argue that the judge made the call based on an extensive record with ten witnesses, with thorough cross-examination by skilled practitioners, and that with a GAL who both knew her job and how to do it. And did a report to the court, not just once but twice. And then went back in on the judge's request to say, if I make a transition, how does this happen? It was done very thoroughly in terms of the technique and the ability to do that. The guardian ad litem determined that on cross-examination that any of these four individuals would be an excellent guardian for EA, but recommended that in the end it should be my client and his wife, and essentially ended up with the court determined because of the breakdown in communication between the petitioners, the grandparents, and my clients, that Casey was able to transition between that. And it's not just, that's not surmise. He had been doing it along the way. He was the one person that everybody was talking to. He was the one person who was able to breach that gap. He was the one person who was willing to, frankly, have, say, in order for us to facilitate doing the best we can for EA, I'm going to step out of my role as your husband and in order to facilitate this. And that's what the court saw from the testimony. And it's ad lit. There is some suggestion that EA had never been in this household. And that is not true. The testimony that we have is that during the pandemic that EA was regularly in the house, that EA was regularly dealing with my client's children on a regular basis, had a relationship with them, and had relationships with people in the neighborhood, children in the neighborhood as well. EA knew this neighborhood, knew his cousins to begin with. You mentioned earlier the art school. That art school was regular. They came in order to facilitate him going to art school, and after school he would come with my parents. I don't, and I don't want this court, want, we had a situation where we had a petition and a cross-petition. And so the court, before there was any evidence before, determined, hey, we're going to do status quo, and then we're going to have a visitation agreement going on here. It shouldn't be a race to the courthouse to see who gets to keep the child. The court, the trial court in this was able to say, we're going to transition after we've done a full hearing, meaning that they had discovery and were able to have all the information and a GAL report in order to facilitate that. Not that the grandparents were the first one to have EA live with them. They shouldn't be fighting over who does it. The decision was made what was in EA's best interest. Again, I think that if we look at the situation and what the court was dealing with, and I agree we have one person in there, Clark Cascio, who actually did not petition but was also part of the equation as being important in his life. Well, then the judge noted that, that there was no question that he determined that there were five people that were very much involved in his life. And he also mentioned the sibling. Yes. Okay? So there are a number of people that are all interested. And the judge found that, like I read earlier, that they all had a great love for this child. Yes, I agree. And Casey was able to facilitate that. I mean, I think the court recognized that because of the trauma that had happened previous in the life of the death of his parents that it was going to take, again, a village of a support group in order to facilitate him going. You know, if the court wants, I can walk through the factors under the domestic relations because there are factors that go directly to the point of facilitating visitation and being able to have this village as part of it, as part of the consideration. They're set out in the cases, unlike the section of the statute you cited and unlike the juvenile court act that your opposing counsel cited. And I sat in domestic relations court for 14 years. Right. So, I mean, you know the factors better than I do in terms of that what the judge was considering is actually a factor in the domestic relations. My opposing counsel cited SUDS, but the statute of factors to be considered in domestic relations has doubled in that. And it's a different section. Yes, and it's a different statute. So, for all those factors and the fact that there's never been anything established in a closed case that specifically the court was not arbitrary, was not capricious, and I believe that the court made the right decision in order to appoint my client, Casey, to be the guardian of the person and the guardian of the state. Thank you. Maroney, you may have a few minutes to continue your argument and rebuttal. Thank you. We filed this appeal because we believed that the trial court's decision was arbitrary, that the main focus was on the communication of the adult's and the adult's feelings, even though the court does emphasize that the five people that were in Enzo's life are important and should remain in Enzo's life, and pointed Casey Lissagic, believing that he could be the one person to bring everybody together. Again, that is not the standard to appoint a guardian of the best interest here. The adult's communicating with each other can be a factor, but it's not the best interest necessarily of the minor if they do communicate with each other, if they do try to have a relationship. Their relationship, whether it's existent or not, should not matter in the totality of making a ruling as to who becomes the guardian. There are many other important factors, as discussed in my previous argument. Yes, I believe that the minor's feelings are very important, where he feels the safety, the trust, the situation that we have here, and this is, you know, guardianship cases and deciding a guardian should be taken by a case-by-case basis. That's why I think there should be a list of factors, even though our common law says that the court has the authority to appoint a guardian that they believe is in the best interest, I think there should be a set of standards for a court to follow, because it can be helpful in certain circumstances, including this one. But those factors are listed in SUCCs, aren't they? Yes, they are. They're not in the Juvenile Court Act. No, they're not. And they're not in the section of the statute that opposing counsel say. Correct. Our case is different, because Enzo has suffered such tremendous trauma in his life, and he was doing well, and he was thriving, and our law also says that for a court to appoint a guardian, again, it should be out of necessity and convenience. We all agree, I think it's necessary that Enzo has a guardian. Excuse me, EA has a guardian. I apologize for that. But removing him from where he is comfortable, where he is thriving, where he is being successful, where he is doing well in school, where he is adapting and coming out of his shell, and removing him in that delicate phase of his life, it's not convenient for him. But it was reasonable for the trial judge to rely on the JAL's opinion and the fact that the JAL had interviewed the therapists, et cetera, and was able to convey what their opinions were. That was a reasonable determination by the trial judge. The issue I take with the guardian of items report is, yes, she did interview the school psychiatrist and his therapist, but the question was never posed to them, what would happen to this child if we move him from this home to this home? The only question that was really ever answered, did you cross-examine on that issue that you think was so important? The guardian of item? Yes. Yes, we did. And what did she say when you asked? Tell us the question you asked, point us to that question, and then tell us how she responded. I'm doing this remembering, I apologize. When we were asking about the school psychiatrist, actually, I will take that back, I did not ask that question. The court, the judge asked that question. I do remember it being asked, but it was not by me. Okay. But then that's when we got into the conversation with boundaries. Again, when asked about the boundaries, I asked the boundary question, because I wanted to know what boundaries that the grandparents were not honoring or crossing with ENZO, and she specifically brought up that, she knew about the visitations for the court orders. And I asked her, again, the question of, when you have a 10- or an 11-year-old child that doesn't want to go somewhere, isn't it difficult to try and make them do something that they don't want to do for the grandparents to honor that court order? It's the grandparents that have to honor the court order, not the child. They have to try and get that child. So that's where the boundary issue came into play. So when the court says that there's issues between childbearing and grandparenting, the only boundary issue that was discussed was those court orders. So in general, there aren't any boundary issues. So you're saying that the only thing that the boundary issues involved in this case was the fact that the child was informed that there were court orders about times that he had to visit with his aunt and uncle? Yes. And you're saying that there was no other problem or any suggestion about boundaries, that there wasn't their testimony that the boundaries were being set by the child? That was a blanket statement, but there was, again, it was a guardian's testimony. Did the guardian testify about that? About the boundaries, that there weren't certain boundaries that should be in place, particularly when a child is entering adolescence? You're saying none of that's in the record? There was a blanket statement, and I, on cross-examination, asked, and the testimony about the court orders came out. The judge never mentioned anything like this in his findings, anything about whether the grandparents, you know, had told the child about court orders and visitation. The judge never even discussed it in his finding. Did he? No, he did not. Okay. And you're saying that the record is the only suggestion of boundaries was that the grandparents told the child that the court had ordered him to have her, sorry, the child to spend time with his aunt and uncle? Yes. That was the testimony that was provided. There were no other boundary issues? Not at all. Did the guardian talk about the difference between grandparenting and parenting? She did, yes. And did she talk about boundaries? She did, and she expressed how Mary Jo and Phil, the grandparents, stepped up into a parenting role. Did Robert Zalander, I forget his last name, did he talk about boundaries? He was concerned with if Enzo thought he was special or not and suggested that maybe there was something he learned outside of, I'm assuming, his grandparents. That would have been an assumption, though. Anything further you wish to add? We would just request that the appellate court reverse the trial court's decision and appoint Mary Jo and Philip Armonico the guardian of the estate and person of EA. All right. Thank you. Thank you both, counsel. The case was well-argued and well-briefed, and we will take this matter under advice.